# EXHIBIT 3

146 FERC ¶ 61,075
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Cheryl A. LaFleur, Acting Chairman;
Philip D. Moeller, John R. Norris,
and Tony Clark.

Columbia Gas Transmission, LLC                    Docket No.  CP13-478-000

ORDER ISSUING CERTIFICATE

(Issued February 7, 2014)

1.      On May 10, 2013,[1] Columbia Gas Transmission, LLC (Columbia) filed an application under sections 7(b) and (c) of the Natural Gas Act (NGA)[2] and part 157, Subpart A of the Commission's regulations[3] for a certificate of public convenience and necessity authorizing the replacement and expansion of existing pipeline facilities located in Greene and Washington Counties, Pennsylvania, and the replacement and expansion of horsepower at Columbia's existing Waynesburg Compressor Station in Greene County, Pennsylvania (Line 1570 Project).  Columbia states that the proposal will result in additional capacity sufficient to provide an additional 99,000 dekatherms (Dth) per day of firm transportation service.

2.      The Commission grants Columbia's requested authorizations subject to the conditions described below.

I.      **Background**

3.      Columbia,[4] a Delaware limited liability company with its principal place of business in Houston, Texas, is a natural gas company[5] that transports natural gas and

---

[1] Columbia supplemented its application on June 4 and 28 and July 30, 2013.

[2] 15 U.S.C. § 717f(b), (c) (2012).

[3] 18 C.F.R. pt. 157, Subpart A (2013).

[4] Columbia is a is a wholly owned subsidiary of the Columbia Energy Group, which in turn is a wholly owned subsidiary of NiSource Inc.

[5] *See* 15 U.S.C. § 717a(6) (2012).

operates underground storage fields in interstate commerce in Delaware, Kentucky, Maryland, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Virginia and West Virginia.

4.      Columbia states that it has developed a system-wide modernization program to address its aging infrastructure.[6]  The modernization program identifies and prioritizes high risk, vulnerable portions of Columbia's system needing upgrades in order to meet emerging safety regulations or to improve service reliability.  Columbia states that the Line 1570 Project is, in part, a part of this program.

## II.   **Proposal**

5.      Columbia proposes to replace approximately 18.52 miles of high pressure, uncoated, bare steel, 20-inch diameter pipeline on Line 1570, between Columbia's Waynesburg Compressor Station in Greene County and its Redd Farm Compressor Station in Washington County, Pennsylvania, with new, 24-inch diameter, coated and wrapped steel pipeline.[7]  Columbia also proposes to replace three of five existing 1,080 horsepower (hp) Solar Saturn turbine-driven compressor units at the Waynesburg Compressor Station with a single new 4,700 hp Solar Centaur 40 turbine-driven compressor unit, increasing the total station horsepower by 1,460 hp.[8]

6.      Columbia states that Line 1570 is a bi-directional (north/south) mainline that is used, along with other pipelines, to meet the gas requirements of the Pittsburgh metropolitan area.  Columbia also states that replacing the existing pipe and older compressors with a larger diameter pipe and additional horsepower will allow it to combine a reliability and replacement project under its modernization program[9] with a

---

[6] On January 24, 2014, the Commission approved a settlement in Docket No. RP12-1021-000, which established the basis for the modernization program, including a mechanism for the recovery of costs associated with the program.  *Columbia Gas Transmission, LLC*, 142 FERC ¶ 61,062 (2013).

[7] The original pipeline to be replaced on Line 1570 was installed in 1947 and 1948 *Manufacturers Light and Heat Co.*, 5 FPC 707 (1946).

[8] The Waynesburg Compressor Station was originally authorized for construction in 1968, *Manufacturers Light and Heat Co.*, 39 FPC 614 (1968).  Two compressor units were installed as a part of the initial authorization and three more were installed between 1968 and 1970, *Manufacturers Light and Heat Co.*, 39 FPC 329 (1968) and *Manufacturers Light and Heat Co.*, 43 FPC 919 (1970).  The current total operating capacity at the Waynesburg Compressor Station is 5,400 hp.

[9] Columbia states that the age and condition of the existing facilities would call for replacement in any event.

project that will enable it to provide additional transportation service to the market. Columbia notes that to provide the full 99,000 Dth per day of firm Line 1570 Project expansion service, it also needs to utilize horsepower at the new Redd Farm Compressor Station proposed as part of its Smithfield III Expansion project.[10]

7.      Columbia plans to offset the new pipeline from the existing pipeline to avoid removing the existing pipeline from service during construction.  However, short-duration outages may be required to tie in new facilities, or to use lift-and-lay construction in areas where offset construction is not feasible.  Most (about 80 percent) of the new pipeline would be collocated within the existing rights of way and the majority of the old pipeline will be abandoned in place.  Columbia will retain its existing easements on property where pipe is proposed for abandonment in place.

8.      Columbia states that the new replacement unit at its Waynesburg Compressor Station will produce less noise and use less fuel than the old units it is replacing.  In addition, the new unit's efficient design will improve air emissions while generating more horsepower.  However, in order to enhance reliability, Columbia proposes to leave the compressor units being replaced at the Waynesburg Compressor Station in place, converting them from base load use to standby facilities.[11]

9.      As noted above, Columbia proposes to provide up to 99,000 Dth per day of additional firm transportation service utilizing the additional capacity resulting from the expansion aspect of the Line 1570 Project.  Columbia estimates the total cost of the Line 1570 Project to be approximately $121.7 million.  Columbia proposes to allocate approximately $17.7 million of total costs to the expansion component of the project.  Columbia proposes to utilize its existing Rate Schedule FTS rates, including all applicable charges and surcharges, as initial recourse rates for expansion service on the project.

---

[10] *See Columbia Gas Transmission, LLC*, 145 FERC ¶ 61,257 (2013) (approving Columbia's Smithfield III Expansion project in Docket No. CP13-477-000 authorizing Columbia to construct and operate a 9,400 hp compressor station in Washington County, Pennsylvania (Redd Farm Compressor Station) and to add compression to its existing Glenville Compressor Station in Gilmer County, West Virginia).  Of the 9,400 hp to be installed at the Redd Farm Compressor Station, 6,400 hp will be used to increase capacity on Line 1570 for shippers on the Line 1570 Project.  Columbia will recover $10,049,170 of the $30,151,639 cost of the Redd Farm Compressor Station from Line 1570 Project shippers.

[11] The horsepower of the standby facilities will not be reflected in the certificated horsepower of the Waynesburg Compressor Station.

10.     On May 17, 2013, Columbia executed a precedent agreement with Range Resources – Appalachia, LLC (Range Resources) for 85,000 Dth per day of expansion service.  Subsequently Columbia conducted an open season and reverse open season between May 17 and May 24, 2013, for the remaining 14,000 Dth per day of expansion capacity.  Columbia received no offers from its existing shippers to turn back capacity.

11.     There were two successful bidders for the remaining 14,000 Dth per day:  Range Resources and Rice Drilling B, LLC (Rice Drilling).  Each party received 50 percent of its bid, or 7,000 Dth per day each.  Columbia finalized a revised precedent agreement with Range Resources, and executed a new precedent agreement with Rice Drilling.  Both shippers have elected to pay a negotiated rate.

## III.     Procedural Issues

12.     Notice of Columbia's application was published in the *Federal Register* on June 4, 2013 (78 Fed. Reg. 33,400).  The parties listed in Appendix B of this order have filed timely, unopposed motions to intervene.[12]  Antero Resources Appalachian Corporation filed comments in support of the application.  The City of Charlottesville, Virginia, the City of Richmond, Virginia, Indicated Shippers,[13] and Washington Gas Light Company filed comments to the application regarding rate issues to which Columbia filed an answer.  We address the comments in the rates section of this order below.

13.     Arthur M. and Beverly F. Wilson (the Wilsons), landowners affected by this proposal, protested the application on environmental grounds and with respect to issues related to the existing right-of-way easement on their property.  On August 15, 2013, Columbia filed a response addressing the Wilsons' environmental and easement concerns.  The Environmental Assessment (EA) for this project and the environmental section of this order address the environmental issues raised by the Wilsons.[14]

---

[12] Timely, unopposed motions to intervene are granted by operation of Rule 214(c) of the Commission's Rules of Practice and Procedure.  *See* 18 C.F.R. § 385.214(c) (2013).

[13] The Indicated Shippers are BP Energy Company, Chevron U.S.A. Inc., ConocoPhillips Company, ExxonMobil Gas & Power Marketing Company, a division of Exxon Mobil Corporation, Hess Corporation, Interstate Gas Supply, Inc. and Noble Energy, Inc.  Indicated Shippers have all separately moved to intervene in this proceeding.

[14] The Wilsons raised issues related to Water Resources, which are discussed in section B.2 of the EA, Soil Resources, discussed in section B.1, Fisheries, Vegetation and Wildlife, discussed in section B.3, and Cultural Resources, discussed in section B.5.

14.     As to the questions regarding the easement, Columbia provided evidence to the Wilsons demonstrating that Columbia is the successor in interest to Manufacturers Light and Heat Company (Manufacturers), which is one party to a 1946 easement between Manufactures and Charles and Hazel Hackney, the predecessors in title to the Wilsons' land.  The Wilsons state that under that 1946 easement they are entitled to compensation from Columbia if Columbia installs a second pipeline on their land.  They argue that Columbia, as successor in interest to Manufacturers, is bound by the terms of the easement.

15.     Issues related to what rights Columbia may have to utilize the Wilson's property under the current easement and whether or not additional compensation or a new conveyance may be required for additional uses are beyond the jurisdiction of this Commission.  Such issues may be addressed under state law in a court of competent jurisdiction.[15]

16.     The Wilsons also maintain that authorizing the project is not in the public interest because, they assert, the purpose of the project is to financially enhance a small segment of the public at the expense of the general public.  We disagree.  Section 1(a) of the NGA states that "the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest."[16]  Section 7(e) of the NGA provides that the Commission shall issue a certificate of public convenience and necessity to any qualified applicant authorizing it to construct and operate facilities to provide the interstate transportation of natural gas if the Commission finds that the proposal "is or will be required by the present or future public convenience and necessity."[17]  For the reasons set forth in the Discussion section of this order, we find that Columbia's proposal in this proceeding is required by the public convenience and necessity.

17.     The Wilsons also request a formal hearing.  Section 7 of the NGA provides for a hearing when an applicant seeks a certificate of public convenience and necessity but does not require that all such hearings be formal trial-type hearings.[18]  An evidentiary trial-type hearing is necessary only where material issues of fact are in dispute and cannot be resolved on the basis of the written record.[19]  We find that no party has raised any

---

[15] *Earle and Julie Smith*, 90 FERC ¶ 61,034 (2000).

[16] 15 U.S.C. § 717(a) (2012).

[17] *Id.* § 717f(e).

[18] *See* 18 C.F.R. § 385.213(a)(2) (2013).

[19] *See id.* § 385.101(e).

material issues of fact that cannot be resolved on the written record.  Therefore, we find no need for an evidentiary trial-type hearing and will deny the request.

## IV.   **Discussion**

18.     Since Columbia seeks to abandon, construct, and operate facilities used in the transportation of natural gas in interstate commerce subject to the jurisdiction of the Commission, the proposal is subject to the requirements of subsections (b), (c), and (e) of section 7 of the NGA.[20]

### A.   **Certificate Policy Statement**

19.     The Certificate Policy Statement provides guidance for evaluating proposals for certificating new construction.[21]  The Certificate Policy Statement established criteria for determining whether there is a need for a proposed project and whether the proposed project will serve the public interest.  The Certificate Policy Statement explained that in deciding whether to authorize the construction of major new pipeline facilities, the Commission balances the public benefits against the potential adverse consequences.  The Commission's goal is to give appropriate consideration to the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the environment, and the unneeded exercise of eminent domain in evaluating new storage and pipeline construction.

20.     Under this policy, the threshold requirement for pipelines proposing new projects is that the pipeline must be prepared to financially support the project without relying on subsidization from its existing customers.  The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, or landowners and communities affected by the route of the new pipeline.  If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects.  This is essentially an economic test.  Only when the benefits outweigh the adverse effects on economic interests will the Commission proceed to complete the environmental analysis where other interests are considered.

---

[20] 15 U.S.C. §§ 717f (b)(c) and 717f(e) (2012).

[21] *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999), *clarifed*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement).

21.     As stated, the threshold requirement is that the applicant must be prepared to
financially support the project without relying on subsidization from its existing
customers.  The Certificate Policy Statement provides that it is not a subsidy for existing
customers to pay for projects designed to replace existing capacity or improve the
reliability or flexibility of existing service.[22]   To the extent that the proposed Line 1570
Project will serve to replace existing pipelines that are deteriorated due to age, enabling
Columbia to meet emerging safety regulations, maintain existing levels of service and/or
provide needed levels of enhanced reliability for existing services, increasing the rates of
existing customers to cover associated costs does not constitute a subsidy under the
Certificate Policy Statement.  Columbia states that it has allocated approximately
$17.7 million of the Line 1570 Project's capital costs to the expansion component of the
project.  That leaves approximately $104 million dollars of capital costs which is being
incurred to maintain and/or improve the service of existing customers, and thus, can be
passed through to existing customers without running afoul of the no-subsidy
requirement.[23]

22.     With respect to the costs Columbia proposes to allocate to the expansion project,
as discussed below, an incremental rate calculated to recover those costs would be less
than Columbia's applicable system rate for service.  Accordingly, and consistent with
Commission precedent,[24] Columbia proposes to establish its existing system rates as the
initial recourse rates for the Line 1570 Project expansion services.  We find approval of
this proposal will prevent subsidization of the expansion service by existing customers.

23.     The Line 1570 Project facilities are designed to both maintain and enhance the
reliability of service to Columbia's existing customers and to enable Columbia to provide
additional, incremental service for new shippers.  The proposal should have no adverse
effect on service to Columbia's existing firm customers.  In addition, no pipelines, or
their captive customers, have filed adverse comments regarding Columbia's proposal.
Thus, we find that the project will not adversely affect Columbia's existing customers or
other pipelines and their customers.

24.     We further find that Columbia has taken steps to minimize any adverse impacts on
landowners and communities that might be affected by its project.  The replacement and
expansion of Columbia's existing Line 1570 will take place within the existing rights-of-

---

[22] Certificate Policy Statement, 88 FERC ¶ 61,227 at n.12.

[23] We note, however, as is discussed below, that the Modernization Settlement
approved by the Commission in Docket No. RP12-1021-000, provides that the precise
allocation of costs for projects with both expansion and modernization components will
be addressed in Columbia's annual capital cost recovery mechanism proceeding.

[24] *See Millennium Pipeline Company, L.L.C.*, 145 FERC ¶ 61,007, at P 30 (2013).

way.  Additionally, installation of the new compressor unit at the existing Waynesburg Compressor Station will not require enlarging the existing facilities' footprint, will be quieter, and will improve air emissions.

25.     Columbia's project will enable Columbia to provide an additional 99,000 Dth per day of firm transportation service to two shippers that have signed precedent agreements for the service.  Based on the benefits the project will provide, the minimal adverse impacts on Columbia's existing customers, other pipelines and their captive customers, and landowners and surrounding communities, we find that Columbia's project is consistent with the Certificate Policy Statement and required by the public convenience and necessity, as conditioned in this order.

### B.     Rates

#### 1.     Initial Recourse Rate

26.     Columbia proposes to utilize its existing Rate Schedule FTS rates, including all applicable charges, and surcharges, as the initial recourse rates for expansion service from the Line 1570 Project.  Columbia states that it allocated approximately $17.7 million of the Line 1570 Project's capital costs to the expansion component of the project.  The estimated incremental monthly firm reservation rate for the expansion service is $2.207 per Dth per day.[25]  This rate is lower than Columbia's currently-effective Rate Schedule FTS base reservation rate of $5.262 per Dth/day.  Since the estimated incremental rate is less than Columbia's existing rate, the Commission will approve the use of Columbia's existing system rates as the initial recourse rates for the new capacity to prevent subsidization of the expansion service by existing shippers.

27.     Columbia also proposes to charge expansion shippers its generally-applicable system fuel and lost and unaccounted-for retention.  Based on engineering data that Columbia used to design the project, the Commission has determined that Columbia's fuel retention would remain the same and that existing shippers will not subsidize or be adversely affected by the fuel charges resulting from this project.  The Commission, therefore, approves Columbia's proposal to charge its generally applicable system fuel and lost and unaccounted-for retention.

#### 2.     Rolled in Rate Determination

28.     Columbia seeks a predetermination that it can roll the costs of the expansion component of the project into its existing rates in a future NGA section 4 rate

---

[25] This value is derived by dividing the first year cost of service of $2,621,560 by the total annual firm design capacity of 1,188,000 Dth (99,000 Dth per day times 12 months).

proceeding.[26]  In support of its request, Columbia provides in Exhibit N of its application a three-year statement of revenues, expenses, and income, as well as a three-year cost-of-service analysis.

29.     Columbia has entered into binding precedent agreements with Range Resources and Rice Drilling.  From November 1, 2014 through October 31, 2015, the agreements provide for 64,000 Dth/day of project capacity.  From November 1, 2015 through October 31, 2024, the agreements provide for the full subscription of 99,000 Dth/day of project capacity.  These precedent agreements provide that the shippers will pay negotiated rates, which are greater than the proposed recourse rates.  In such instances, when the Commission considers a request for rolled-in rate treatment, the Commission has generally compared project costs with the revenues that would be generated if all project services under contract were provided at the maximum recourse rate.  Here, we have calculated Columbia's projected revenue for the first year of the project to be $4,041,216 and $6,251,256 for the following year.[27]  Therefore, the projected revenues would exceed the projected cost of service for the first year by $1,419,656 and $3,712,733 in the second year.  We find, absent changed circumstances, rolled-in treatment of the proposed costs would not require subsidies from existing customers.

### 3.    **Comments**

30.     On June 18, 2013, comments were filed by The Cities of Charlottesville, Virginia and Richmond, Virginia, Washington Gas Light Company, and Indicated Shippers (collectively, Commenters) in regard to Columbia's cost-recovery mechanism adopted under its Modernization Settlement with the Commission.[28]  The Commenters claim that the Modernization Settlement seeks to avoid the necessity of shipper participation in numerous individual section 7(c) and prior notice blanket certificate proceedings to address issues related to the allocation of costs between an expansion and the capital cost recovery mechanism (CCRM).  Those issues, the Commenters assert, are to be addressed in annual CCRM proceedings.  The Commenters request that the Commission refrain

---

[26] Columbia intends to recover the replacement component of its project consistent with the capital cost recovery mechanism (CCRM) adopted under its Modernization Settlement with the Commission.  *See Columbia Gas Transmission, LLC*, 142 FERC ¶ 61,062 (2013) (Modernization Settlement).

[27] Revenues were calculated utilizing the actual contracted capacity of 64,000 Dth per day for the first year and 99,000 Dth per day for the following year, and the currently effective maximum Rate Schedule FTS recourse reservation rate of $5.262 per Dth per day.

[28] *See Columbia Gas Transmission, LLC*, 142 FERC ¶ 61,062 (2013) (Modernization Settlement).

from making any statements or rulings that would affect implementation of the Modernization Settlement.

31.     The Commission clarifies that it is not making a determination on the allocation of costs to be recovered pursuant to the Modernization Settlement in this proceeding.  As the Commenters correctly note, the Modernization Settlement provides that the allocation of costs between an expansion project and the modernization program will be addressed in individual CCRM proceedings.  However, if there is a significant change in the allocation of costs to the Line 1570 Project services in a future CCRM proceeding, the parties will be able to re-examine the Commission's predetermination of rolled-in pricing based on a change in circumstances.

### 4.     Record Keeping

32.     To aid the parties in their review of Columbia's Line 1570 Project costs in future CCRM proceedings and any challenge to rolled-in pricing of the project's costs, the Commission will require Columbia to keep separate books and accounting of costs attributable to the new facilities.  Further, the books should be maintained with applicable cross-reference as required by section 154.309 of the Commission regulations.  This information must be in sufficient detail so that the data can be identified in Statements G, I, and J in any future NGA section 4 or 5 rate case and provided consistent with Order No. 710 on incremental facilities.[29]

### 5.     Service Agreements

33.     Columbia states that it will provide service to its customers under negotiated rate agreements pursuant to the negotiated rate authority in its General Terms and Conditions.[30]  Columbia must file either its negotiated rate agreements or tariff records setting forth the essential terms of the agreements associated with the project, in accordance with the Alternative Rate Policy Statement[31] and the Commission's

---

[29] *Revisions to Forms, Statements, and Reporting Requirements for Natural Gas Pipelines*, Order No. 710, FERC Stats. & Regs. ¶ 31,267, at P 23 (2008).

[30] *See* Columbia Gas Transmission, LLC, FERC NGA Gas Tariff, Baseline Tariffs, Gen. Terms & Conditions, Negotiated Rates, 0.0.0.

[31] *Alternatives to Traditional Cost-of-Service Ratemaking for Natural Gas Pipelines; Regulation of Negotiated Transportation Services of Natural Gas Pipelines*, 74 FERC ¶ 61,076, *order granting clarification*, 74 FERC ¶ 61,194 (1996).

negotiated rate policies.[32]  Columbia must file the negotiated rate agreements or tariff records at least 30 days, but not more than 60 days, before the in-service date of the proposed facilities.

### C.   Environmental Analysis

34.   On July 2, 2013, the Commission issued a *Notice of Intent to Prepare an Environmental Assessment* (NOI).  The NOI was published in the *Federal Register*[33] and mailed to interested parties including federal, state, and local officials; agency representatives; conservation organizations; potentially interested Indian tribes; local libraries and newspapers; and affected property owners, including landowners within 0.5 mile of Columbia's proposed compressor station upgrade.

35.   We received five comments in response to the NOI from the Clean Air Council (CAC), two landowners (the Wilsons), and two interested parties.  Primary issues raised concerned potential contamination from the abandonment of the existing Line 1570, as well as construction impacts on waterbodies, wildlife, and cultural resources.

36.   The CAC raised general concerns about cumulative impacts and natural gas production and its effect on climate change, and the environmental review of the Line 1570 Project, and Columbia's Smithfield III Expansion Project as separate projects.  The CAC also:  1) states that an environmental impact statement (EIS) is necessary; 2) identifies supposed deficiencies in Columbia's treatment of air quality in its application; 3) advocates the need for further air modeling; and 4) suggests that alternative equipment and pollution controls may reduce the impacts of the project.

37.   To satisfy the requirements of the National Environmental Policy Act of 1969 (NEPA),[34] our staff prepared an EA for Columbia's proposal.  The analysis in the EA addressed geology, soils, water resources, wetlands, vegetation, fisheries, wildlife, threatened and endangered species, land use, recreation, visual resources, cultural resources, air quality, noise, safety, cumulative impacts, and alternatives.  The EA was placed in the public record for this proceeding on November 22, 2013, and addressed all substantive comments received during the public scoping period, as summarized below. There were no comments filed on the EA.

---

[32] *Natural Gas Pipelines Negotiated Rate Policies and Practices; Modification of Negotiated Rate Policy*, 104 FERC ¶ 61,134 (2003), *order on reh'g and clarification*, 114 FERC ¶ 61,042, *dismissing reh'g and denying clarification*, 114 FERC ¶ 61,304 (2006).

[33] 78 Fed. Reg. 41,393 (July 10, 2013).

[34] 42 U.S.C. §§ 4321-4347 (2012).

38.     Regarding the contamination concern with the abandoned pipeline, the EA states that the existing Line 1570 will be disconnected from all sources and supplies of natural gas and purged of all liquids and contaminants which will then be disposed of in accordance with applicable regulations.  Any open ends or other openings made in the existing pipeline during abandonment procedures will be sealed.[35]  As a result, the abandoned pipeline will not be a source of soil or water contamination.

39.     The Wilsons also expressed concern about the potential impact on wildlife and its habitat through the removal of vegetation.  As stated in the EA, Columbia's proposal will minimize impacts on these resources by collocating approximately 86 percent of the project along the existing Line 1570.  Columbia has also adopted the FERC *Upland Erosion Control, Revegetation, and Maintenance Plan* and *Wetland and Waterbody Construction and Mitigation Procedures* into its project-specific Environmental Construction Standards (ECS).  Columbia's ECS also includes a Spill Prevention, Containment, and Countermeasure Plan (SPCC Plan).  The ECS and SPCC Plan are described in the EA and were reviewed by our staff.

40.     Our staff also consulted with the U.S. Fish and Wildlife Service (FWS) as required under section 7 of the Endangered Species Act (ESA),[36] and it was determined that the project is not likely to adversely affect the Indiana bat.  Concurrence from the FWS was received via letter dated July 10, 2013.  No further ESA consultation is required.[37]  The EA concludes that impacts through the removal of vegetation along the proposed pipeline replacement will not significantly impact wildlife and its habitat.[38]

41.     Arthur M. Wilson expressed concern regarding the potential impact on cultural resources as the pipeline crosses through a meadow believed to be the site of past Native American activity.  As outlined in the EA, Columbia completed cultural resources surveys and provided the resulting reports to FERC staff and to the Pennsylvania State Historic Preservation Office (SHPO).  Columbia also provided an Unanticipated Discovery Plan which both our staff and the SHPO reviewed, requested minor revisions, and then found acceptable.[39]  The EA and SHPO concluded that the project would not affect historic properties.

---

[35] EA at 7.

[36] 16 U.S.C. § 1536 (2012).

[37] EA at 31.

[38] EA at 26.

[39] EA at 39.

### 1.   <u>Cumulative Impacts</u>

42.     In its scoping comments, the CAC states that cumulative impacts of the project should be considered with respect to natural gas production and greenhouse gas emissions (GHG) known to contribute to climate change.  The CAC further commented that all direct and indirect impacts of the project should be considered, including impacts of existing and reasonably foreseeable Marcellus Shale gas development on air quality and climate change.

43.     The EA addresses cumulative impacts, including Marcellus Shale activities in the vicinity of the Line 1570 Project and GHGs, and concluded that due to the limited scope and impacts of the project, air quality was the only resource that could potentially be cumulatively affected.

44.     The project's associated operating emissions would not exceed the National Ambient Air Quality Standards and will be mitigated by federal, state, and local permits and approvals.  Moreover, the EA states that in August 2013, the Pennsylvania Department of Environmental Protection (PADEP) finalized air quality permitting criteria for unconventional gas well sites, which would mitigate air emissions from Marcellus Shale drilling/operating activities.[40]  Thus, we do not find that the project will contribute to a cumulative impact on regional air quality as a result of its operation.[41]

45.     The EA quantified the potential GHG emissions from the project's stationary, fugitive, and construction sources.  The potential increase in GHG emissions from operation of the stationary source (i.e., the Waynesburg Compressor Station) is anticipated to be a total of 68,185 tons per year of $CO_{2e}$ under conservative projections and 42,997 tons per year under ideal case projections;[42] construction would emit 2,564 tons of $CO_{2e}$.[43]  By way of comparison, the U.S. Environmental Protection Agency's (EPA) threshold for permitting is 100,000 tons per year of $CO_{2e}$ from a single stationary source (excluding construction-related emissions).[44]  Emissions from none of the proposed stationary sources exceed that level.  Further, under EPA's GHG reporting program, Columbia will be required to report the GHG emissions when actual emissions

---

[40] EA at 54.

[41] EA at 54.

[42] EA at 45 and 46.

[43] EA at 45.

[44] *See* 40 C.F.R. § 52.21(b)(49)(v) (2013).

exceed 25,000 tons $CO_{2e}$ per year from any stationary source.[45]  Regarding cumulative emissions of non-GHG pollutants, the EA identified other emission sources and concluded that there will be no significant cumulative impacts.[46]

## 2.  Segmenting Projects

46.  The CAC comments that Columbia's Line 1570 Project and Smithfield III Expansion Project should be considered together and urges the Commission to consider whether Columbia has improperly segmented the two projects to avoid comprehensive environmental review.

47.  Improper segmentation of a project occurs when interrelated projects are artificially divided into smaller, less significant components in order to avoid the NEPA requirement that an EIS be prepared for all major federal actions with significant environmental impacts.[47]  To determine whether a proposal has been improperly segmented, courts have considered such facts as whether the proposed segment (1) has logical termini; (2) has substantial independent utility; (3) does not foreclose the opportunity to consider alternatives; and (4) does not irretrievably commit federal funds for closely related projects.[48]  The Council of Environmental Quality's (CEQ) NEPA regulations provide guidance on when actions should be analyzed together or separately. Specifically, CEQ's regulations provide that proposals should be analyzed in the same EIS if they are "connected" (i.e., "closely related").[49]  Actions are connected if they

---

[45] *See id.* § 98.231.

[46] EA at 51 and 52.  To the extent the CAC's scoping comments suggest that the Commission must conduct a more expansive analysis of any impacts associated with natural gas development, we disagree.  We conclude that there are too many uncertainties about specific Marcellus Shale development and its environmental impacts to provide any meaningful consideration in a cumulative impact analysis.  *See Central New York Oil and Gas Company,* 137 FERC ¶ 61,121 (2011), *order on rehearing,* 138 FERC ¶ 61,104 (2012) and *Transcontinental Gas Pipe Line Company,* 145 FERC ¶ 61,152 at P 45 (2013).  Given the limited scope of Columbia's Line 1570 project, the largest portion of which is being constructed to enhance/maintain service to existing customers and which will impose limited direct or indirect impacts, we find that the EA's cumulative impact assessment is appropriate.

[47] *See Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294,298 (1987).

[48] *See Jackson County, N.C. v. FERC*, 589 F.3d 1284, 1290 (D.C. Cir. 2009); *O'Reilly v. U.S. Army Corps of Engineers*, 277 F.3d 225, 236 (5th Cir. 2007).

[49] 40 C.F.R. § 1508.25(a)(1)(iii) (2013).

automatically trigger other actions that may require an EIS, cannot or will not proceed unless other actions are taken previously or simultaneously, or are interdependent of a larger action and depend on the larger action for their justification.[50]

48.     Here, it is apparent that the Line 1570 Project and Smithfield III Expansion Project have substantial independent utility.  As explained in this order, the purpose of the Line 1570 Project is to modernize Columbia's existing infrastructure in order to improve its reliability and to provide 99,000 Dth per day of additional natural gas transportation service to Columbia's existing Waynesburg Compressor Station in Greene County, Pennsylvania.  The purpose of the Smithfield III Expansion Project is to enlarge Columbia's mainline capacity in order to provide firm transportation service for 444,000 Dth/day of natural gas, 94 percent of which transportation service has been subscribed by three new shippers to an interconnection with Columbia Gulf's system in Leach County, Kentucky.  Neither project shares similar shippers.  Neither project triggers another action nor are they dependent on a larger action; therefore, they are not connected.  We find that the two projects were not improperly segmented.

49.     Moreover, the EA includes resource impact information for the Smithfield III Expansion Project and considered the impacts of that Project on the Line 1570 Project in the cumulative impacts section.[51]  Impacts were determined to be minor.  We find that the EA complies with NEPA requirements and CEQ's NEPA guidance.

### 3.       Whether an EIS is Appropriate for the Project

50.     The CAC believes the preparation of an EIS, rather than an EA, is necessary in order to consider the direct, indirect, and cumulative impacts associated with the Line 1570 Project.  The CEQ regulations implementing NEPA state that one of the purposes of an EA is to assist agencies in determining whether to prepare an EIS or a finding of no significant impact.[52]  Consistent with CEQ's regulations, the Commission's policy is to prepare an EA, rather than an EIS, if our initial review indicates that a project is not likely to be a major federal action significantly affecting the quality of the human environment.  The Commission's NEPA regulations require preparation of an EIS for a "major pipeline construction project."[53]  Our regulations do not define or explain what constitutes a "major" pipeline construction project.  However, the Commission's years of

---

[50] *See id.* § 1508.25(a)(1).

[51] EA at 51 to 56.

[52] *See* 40 C.F.R. § 1508.9 (2013).

[53] *See* 18 C.F.R. § 380.6(a)(3) (2013).

experience with NEPA implementation for natural gas projects indicate that construction and operation of approximately 18.5 miles of 24-inch-diameter replacement pipeline, and modifications and addition of horsepower at an existing compressor station, would not fall under the "major" category for which an EIS is automatically prepared. As indicated in the EA, no significant impacts will occur as a result of the construction, abandonment, and operation of this project.[54] We affirm the EA's findings and reject the CAC's assertion than an EIS is required.

## 4.      Air Quality Application Deficiencies

51.     The CAC believes that Columbia's Waynesburg Compressor Station and Redd Farm Compressor Station (proposed in Columbia's Smithfield III Expansion Project) should be considered a single source facility for New Source Review and Title V air permitting, which would trigger major source reviews. The EA explains that the PADEP is responsible for permitting the Waynesburg and Redd Farm Compressor Stations, including identifying whether these sources should be considered a single source and determining applicability to the New Source Review and Title V programs.[55] Columbia applied for the air permits with the PADEP in May and August 2013, respectively. A response from PADEP is expected in April 2014.

## 5.      Air Quality Modeling

52.     The CAC contends that Columbia should be required to perform dispersion modeling to properly assess air quality impacts of the Line 1570 Project.[56] The CAC further comments that additional pollution control technologies should be considered, including selective catalytic reduction and potential replacement and retrofits that mitigate degradation to air quality.

---

[54] EA at 62.

[55] EA at 42.

[56] The CAC also referenced an air model that it conducted for the Barto Compressor Station, which alleged that nitrogen dioxide emissions from the station exceeded National Ambient Air Quality Standards (NAAQS). The PADEP, which is responsible for monitoring air quality within the state to ensure compliance with the Clean Air Act, concluded that it did not detect any nitrogen dioxide measurements greater than NAAQS and stated that it would continue to monitor the impacts of the Marcellus Shale development activities on air quality. The response of Columbia to comments of the CAC was filed on September 5, 2013.

53.     As stated in the EA, Columbia conducted a quantitative assessment of project air emissions using air dispersion modeling through the screening function of the EPA's AERMOD.  The EA identifies the modeling results for the Waynesburg Compressor Station in comparison with National Ambient Air Quality Standards (NAAQS).  The results, as outlined in the EA, demonstrate that emissions from the Waynesburg Compressor Station following completion of the project are below NAAQS, and operations will not result in regionally significant impacts on air quality.[57]

## 6.     Alternatives Analysis and Recommendations

54.     The CAC suggests that the Commission consider alternatives to the proposed action, mentioning renewable energy sources including solar, offshore wind, and energy conservation and efficiency measures.  Renewable energy sources relate to energy generation usage and have no relation to the transport of natural gas.  The EA concludes that suggested alternatives would not meet the project objectives (i.e. to modernize Line 1570 and to create pipeline capacity to provide up to 99,000 Dth per day of firm transportation service).

55.     The CAC further comments that additional pollution control technologies should be considered, including selective catalytic reduction and potential replacement and retrofits that mitigate degradation to air quality.  We confirm here that Columbia's Waynesburg Compressor Station modification incorporates emission reduction technology.  Further, Environmental Condition 8 in Appendix A to this order requires Columbia to file documentation that it has received all necessary authorizations required under federal law, which will include the required PADEP air permit.  As stated in the EA, Columbia must demonstrate to the state agency that emissions from the Waynesburg Compressor Station will not exceed acceptable levels, and Columbia must obtain the requisite air quality permit.[58]  The PADEP is responsible for enforcing the federally authorized state implementation plan to comply with air quality standards according to the Clean Air Act.  Columbia's compliance with the permitting process ensures minimization of air quality impacts.  Thus, the EA concludes that analyses of additional emission control technology alternatives are not warranted.[59]  We concur.

56.     The CAC further requests consideration of a new electric-driven compressor unit as an alternative to the new gas-fired turbine unit at the Waynesburg Compressor Station.  The Waynesburg Compressor Station is an existing smaller sized natural-gas

---

[57] EA at 47 to 48.

[58] EA at 60 to 61.

[59] EA at 61.

fired compressor station with a total of 5,400 hp, and the new 4,700 hp natural gas-fired turbine proposed for the facility will replace three existing natural gas-fired turbine units (totaling 3,240 hp).  As stated in the EA, the installation of a new, efficient compressor unit will allow Columbia operational flexibility, as all five existing compressor units would remain in service at the station; however, Columbia will only operate up to two existing units at the same time as the new Centaur unit.  Under Columbia's operating conditions analyzed in the EA, the facility continues to remain a minor source with respect to the air permitting requirements.  The EA concludes that the modifications will not result in significant additional emissions at the facility to warrant the consideration of introducing an electric-driven unit, the addition of a potential electric substation to provide power, and any needed additional power lines and land disturbance.

57.    Based on the analysis in the EA, we conclude that if constructed and operated in accordance with Columbia's application and supplements, and in compliance with the environmental conditions in Appendix A to this order, our approval of this proposal will not constitute a major federal action significantly affecting the quality of the human environment.

58.    Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate.  The Commission encourages cooperation between interstate pipelines and local authorities.  However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[60]

59.    The Commission on its own motion received and made a part of the record in this proceeding all evidence, including the application(s), as supplemented, and exhibits thereto, submitted in support of the authorizations sought herein, and upon consideration of the record,

The Commission orders:

    (A)    A certificate of public convenience and necessity is issued authorizing Columbia to construct and operate the Line 1570 Project, as described more fully in this order and in the application.

_____

    [60] *See, e.g., Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293 (1988)*; National Fuel Gas Supply v. Public Service Commission*, 894 F.2d 571 (2d Cir. 1990); and *Iroquois Gas Transmission System, L.P., et al.*, 52 FERC ¶ 61,091 (1990) and 59 FERC ¶ 61,094 (1992).

(B)      The certificate issued in Ordering Paragraph (A) is conditioned on:

       (1)      Columbia's completing the authorized construction of the proposed facilities and making them available for service within two years of the date of this order pursuant to section 157.20(b) of the Commission's regulations;

       (2)      Columbia's compliance with all applicable Commission regulations, including paragraphs (a), (c), (e), and (f) of section 157.20 of the Commission's regulations;

       (3)      Columbia's compliance with the environmental conditions listed in Appendix A to this order.

(C)      Columbia's proposed initial rates are approved.

(D)      Columbia's request for a predetermination for rolled-in rate treatment for the costs of the Line 1570 Project in its next general NGA section 4 rate proceeding is granted, barring a significant change in circumstances, as discussed in the body of this order.

(E)      Columbia must file not less than 30 days, or more than 60 days, before the in-service date of the proposed facilities, all negotiated rate agreements or a tariff record describing the negotiated rate agreements associated with this project.

(F)      Columbia shall notify the Commission's environmental staff by telephone, electronic mail, and/or facsimile of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies Columbia. Columbia shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

By the Commission.

( S E A L )

                                        Nathaniel J. Davis, Sr.,
                                          Deputy Secretary.

Docket No. CP13-478-000                                          - 20 -

## Appendix A

As recommended in the environmental assessment (EA), this authorization includes the following conditions:

1.    Columbia shall follow the construction procedures and mitigation measures described in its application, supplements (including responses to staff data requests) and as identified in the EA, unless modified by this order.  Columbia must:

   a.    request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);
   b.    justify each modification relative to site-specific conditions;
   c.    explain how that modification provides an equal or greater level of environmental protection than the original measure; and
   d.    receive approval in writing from the Director of Office of Energy Projects (OEP) before using that modification.

2.    The Director of OEP has delegated authority to take whatever steps are necessary to ensure the protection of all environmental resources during construction and operation of the project.  This authority shall allow:

   a.    the modification of conditions of this order; and
   b.    the design and implementation of any additional measures deemed necessary (including stop-work authority) to assure continued compliance with the intent of the environmental conditions as well as the avoidance or mitigation of adverse environmental impact resulting from project construction, operation, and abandonment.

3.    **Prior to any construction**, Columbia shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, environmental inspectors (EIs), and contractor personnel will be informed of the EI's authority and have been or will be trained on the implementation of the environmental mitigation measures appropriate to their jobs **before** becoming involved with construction and restoration activities.

4.    The authorized facility locations shall be as shown in the EA.  **As soon as they are available, and before the start of construction**, Columbia shall file with the Secretary any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by this order.  All requests for modifications of environmental conditions of this order or site-

specific clearances must be written and must reference locations designated on these alignment maps/sheets.

Columbia's exercise of eminent domain authority granted under Natural Gas Act section 7(h) in any condemnation proceedings related to this order must be consistent with these authorized facilities and locations.  Columbia's right of eminent domain granted under Natural Gas Act section 7(h) does not authorize it to increase the size of its natural gas pipeline to accommodate future needs or to acquire a right-of-way for a pipeline to transport a commodity other than natural gas.

5.    Columbia shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, pipe storage yards, new access roads, and other areas that would be used or disturbed and have not been previously identified in filings with the Secretary.  Approval for each of these areas must be explicitly requested in writing.  For each area, the request must include a description of the existing land use/cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area.  All areas shall be clearly identified on the maps/sheets/aerial photographs.  Each area must be approved in writing by the Director of OEP **before construction in or near that area**.

This requirement does not apply to extra workspace allowed by FERC's *Upland Erosion Control Revegetation Maintenance Plan* and/or minor field realignments per landowner needs and requirements which do not affect other landowners or sensitive environmental areas such as wetlands.

Examples of alterations requiring approval include all route realignments and facility location changes resulting from:

a.    implementation of cultural resources mitigation measures;
b.    implementation of endangered, threatened, or special concern species mitigation measures;
c.    recommendations by state regulatory authorities; and
d.    agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6.    **Within 60 days of the acceptance of the Certificate and before construction begins**, Columbia shall file an Implementation Plan with the Secretary for review and written approval by the Director of OEP.  Columbia must file revisions to the plan as schedules change.  The plan shall identify:

a. how Columbia will implement the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests), identified in the EA, and required by this order;

b. how Columbia will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to onsite construction and inspection personnel;

c. the number of EIs assigned, and how the company will ensure that sufficient personnel are available to implement the environmental mitigation;

d. company personnel, including EIs and contractors, who will receive copies of the appropriate material;

e. the location and dates of the environmental compliance training and instructions Columbia will give to all personnel involved with construction and restoration (initial and refresher training as the project progresses and personnel change).

f. the company personnel (if known) and specific portion of Columbia's organization having responsibility for compliance;

g. the procedures (including use of contract penalties) Columbia will follow if noncompliance occurs; and

h. for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

(1) the completion of all required surveys and reports;
(2) the environmental compliance training of onsite personnel;
(3) the start of construction; and
(4) the start and completion of restoration.

7. Beginning with the filing of its Implementation Plan, Columbia shall file updated status reports with the Secretary **on a biweekly basis until all construction and restoration activities are complete**. On request, these status reports will also be provided to other federal and state agencies with permitting responsibilities. Status reports shall include:

a. an update on Columbia's efforts to obtain the necessary federal authorizations;

b. the construction status of the project, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally sensitive areas;

c. a listing of all problems encountered and each instance of noncompliance observed by the EI during the reporting period (both for the conditions

imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

d.      a description of the corrective actions implemented in response to all instances of noncompliance, and their cost;

e.      the effectiveness of all corrective actions implemented;

f.      a description of any landowner/resident complaints which may relate to compliance with the requirements of this order, and the measures taken to satisfy their concerns; and

g.      copies of any correspondence received by Columbia from other federal, state, or local permitting agencies concerning instances of noncompliance, and Columbia's response.

8.      **Prior to receiving written authorization from the Director of OEP to commence construction of any project facilities**, Columbia shall file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

9.      Columbia must receive written authorization from the Director of OEP **before placing the project into service**.  Such authorization will only be granted following a determination that rehabilitation and restoration of the right-of-way and other areas affected by the project are proceeding satisfactorily.

10.     **Within 30 days of placing the authorized facilities in service**, Columbia shall file an affirmative statement with the Secretary, certified by a senior company official:

a.      that the facilities have been constructed in compliance with all applicable conditions, and that continuing activities will be consistent with all applicable conditions; or

b.      identifying which of the Certificate conditions Columbia has complied with or will comply with.  This statement shall also identify any areas affected by the project where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

11.     **Prior to construction,** Columbia shall file a Fugitive Dust Control Plan with the Secretary, for review and written approval of the Director of OEP.  The plan must specify the following:

a.      the precautions that Columbia will take to minimize fugitive dust emissions from construction activities, including additional mitigation measures to control fugitive dust emissions of Total Suspended Particulates and

particulate matter with an aerodynamic diameter less than or equal to
10 microns, such as:

    (i)      watering the construction workspace and access roads;

    (ii)     measures to limit track-out onto the roads;

    (iii)    the speed limit that Columbia would enforce on unsurfaced roads; and

    (iv)    covering open-bodied haul trucks, as appropriate;

b.    the individuals with the authority to determine if/when water needs to be reapplied for dust control;

c.    the individuals with the authority to determine if/when a palliative needs to be used; and

d.    the individuals with the authority to stop work if the contractor does not comply with dust control measures.

12.    Columbia shall file a noise survey with the Secretary **no later than 60 days** after placing the modified Waynesburg Compressor Station in service.  If a full load condition noise survey is not possible, Columbia shall file an interim survey at the maximum possible horsepower load and file the full load survey **within 6 months**. Columbia shall make all reasonable efforts to ensure its predicted noise levels from operation of the new compressor unit and any two existing compressor units at the modified Waynesburg Compressor Station are not exceeded at any nearby noise sensitive areas (NSAs).  In addition, if operation of the new compressor unit at full or interim horsepower load conditions exceeds a day-night average sound level of 55 decibels at any nearby NSAs, Columbia shall file a report on what changes are needed and should install the additional noise controls to meet the level **within 1 year** of the in-service date.  Columbia shall confirm compliance with the above requirements by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

# Appendix B

# Timely Intervenors

Antero Resources Appalachian Corporation
Arthur M. and Beverly F. Wilson
Atmos Energy Marketing LLC
BP Energy Company
Chevron U.S.A. Inc.
City of Charlottesville, Virginia
City of Richmond, Virginia
Columbia Gas of Kentucky, Inc., Columbia Gas of Maryland, Inc., Columbia Gas of Ohio, Inc., Columbia Gas of Pennsylvania, Inc., and Columbia Gas of Virginia, Inc. (together known as NiSource Distribution Companies)
ConocoPhillips Company
Exelon Corporation
Hess Corporation
Interstate Gas Supply, Inc.
National Fuel Gas Distribution Corporation
National Grid Gas Delivery Companies
New Jersey Natural Gas Company
NJR Energy Services Company
Noble Energy, Inc.
Orange and Rockland Utilities, Inc.
Statoil Natural Gas LLC
PSEG Energy Resources & Trade LLC
Piedmont Natural Gas Company, Inc.
UGI Utilities, Inc., UGI Penn Natural Gas, Inc., and UGI Central Penn Gas, Inc. (together known as UGI Distribution Companies)
Virginia Natural Gas, Inc.
Washington Gas Light Company